438 A.2d 600

**FIRST PENNSYLVANIA BANK, N.A.**

v.

**Carl LEHR, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 11, 1979.

Filed Feb. 6, 1981.

190

Stuart H. Savett, Philadelphia, for appellant.

Norman R. Bradley, Philadelphia, for appellee.

Before SPAETH, HESTER and CAVANAUGH, JJ.

HESTER, Judge:

Presently before the court is appellant Carl Lehr's (sometimes Lehr) appeal from the order of the lower court dated November 30, 1978 wherein the court denied appellant's petition to open judgment and denied appellant's petition to strike off the judgment, excepting for interest payments made subsequent to the entry of said judgment.

On July 29, 1977, appellee, First Pennsylvania Bank, N.A. (sometimes bank) confessed judgment against the appellant in the amount of $3,782,160.00[1] pursuant to a warrant of attorney contained in a personal Guaranty dated April 25, 1972. On December 7, 1977, appellant filed a Petition to Strike or Open the Judgment. Depositions of the appellant and other individuals involved in this matter were taken and oral argument was heard by the court en banc on September 8 and November 8, 1978.

On November 30, 1978, appellant's petition to strike off the judgment was granted but only in regard to interest payments made subsequent to the entry of the judgment; in all other respects it was denied. Appellant's petition to open judgment was also denied. Thereafter, this timely appeal followed.

1. The itemization of amount due contained in the complaint for confession of judgment was as follows:

ITEMIZATION OF AMOUNT DUE:

| | | |
|---|---|---|
| Principal unpaid balance | | $3,500,000.00 |
| Interest thru July 31, 1977 | | 208,000.00 |
| Attorney's fee (2%) | | 74,160.00 |
| | Total | $3,782,160.00 |

We reverse and open the judgment taken by confession and remand to the lower court for a trial on the merits.

■ Our scope of review on appeal from either the opening or the denial of opening a judgment taken by confession has been clearly delineated over numerous years. We reiterate as we have done on numerous occasions, our scope of review on appeals from the lower court's grant or denial of a petition to open judgment is very narrow. A petition to open judgment is first an appeal to the equitable and discretionary powers of the lower court and as such, the exercise of the lower court's discretion in either opening or refusing to open a judgment taken by confession, will not be disturbed on appeal unless the lower court has committed a manifest abuse of discretion or an error of law. *M. H. Davis Estate Oil v. Sure Way Oil*, 266 Pa.Super. 64, 403 A.2d 95 (1979); *Fidelity Bank v. Act of America, Inc.*, 258 Pa.Super. 261, 392 A.2d 784 (1978); *Christie v. Open Pantry Marts*, 237 Pa.Super. 243, 352 A.2d 165 (1975).

It is well settled that "(o)ne who petitions to open a confessed judgment must act promptly and aver a meritorious defense", *Wenger v. Ziegler*, 424 Pa. 268, 272, 226 A.2d 653, 655 (1967). There is no question that the appellant herein acted promptly; thus the sole issue is whether he set forth a meritorious defense.

The standard to be applied by a court in determining whether a moving party has properly averred a meritorious defense so as to require that a confessed judgment be opened and the moving party let into a defense is succinctly set forth at Pa.R.C.P. 2959(e), effective December 1, 1973, which provides in relevant part:

"... If evidence is produced which in a jury trial would require the issues to be submitted to a jury the court *shall* open the judgment." (Emphasis added).

■ In testing the sufficiency of the evidence, the facts as alleged must be viewed by the court in the exercise of its discretion in the light most favorable to the moving party (the appellant herein) and further, the lower court must

accept as true all *evidence* and reasonable and proper inferences flowing therefrom. (Emphasis added). *Greenwood v. Kadoich,* 239 Pa.Super. 372, 357 A.2d 604 (1976); *M. H. Davis Estate Oil v. Sure Way Oil,* supra. As Judge Van der Voort of our court in *M. H. Davis Estate Oil v. Sure Way Oil,* supra, declared:

> ". . . the test in evaluating the petitioners' evidence is not whether the evidence will probably win a verdict from the jury, but only whether there is sufficient evidence to allow the disputed issue to go to the jury."

■ Rule 2959(e) has been interpreted since its promulgation in 1973 as prohibiting a court from "weighing" the sufficiency of the evidence. See *Christie v. Open Pantry Marts,* supra; *Joseph A. Puleo & Sons, Inc. v. Rossi et ux.,* 234 Pa.Super. 612, 340 A.2d 557 (1975); *Wolgin v. Mickman,* 233 Pa.Super. 218, 335 A.2d 824 (1975); *Commonwealth ex rel. Mazza v. Sarvice,* 227 Pa.Super. 38, 323 A.2d 41 (1974).

With the above statement of the law as our guide, the record reveals the following: Appellant Lehr was one of several individuals who provided capital for the construction and operation of the Pocono International Raceway, Inc., (hereinafter Raceway), when a group of investors, including Lehr, decided to expand the Pocono Racetrack into a super speedway. At divers time, Lehr was a stockholder, director of the corporation, treasurer of same and creditor, personally holding $400,000.00 in judgment notes for loans to the corporation. Additionally, Lehr held warrants to purchase additional shares of common stock. Finally, a family enterprise owned by Lehr also was a $100,000.00 creditor of the Raceway. Dr. Joseph R. Mattioli was then chief executive officer and chairman of the board at the time of the completion of the Raceway in 1971. At that time, the investors realized that additional capital was needed to meet both current and future short-term operating obligations. Following extensive negotiations, the bank, the appellee herein, was chosen to provide this financing and a complex loan agreement package was structured. In return for five million dollars, the Raceway executed a note, at 4% over prime

(16% at that time), which note was collateralized by a first mortgage on the Raceway's real estate. To further secure said loan, the investors, which obviously included appellant Lehr, were called upon to execute a pledge agreement with respect to their equity in the Raceway, a subordination agreement of their debt obligations in favor of the bank's loan, a joint indemnification agreement, and personal guaranty agreements (Exhibit 1 to appellee's complaint in confession of judgment).

It is this guaranty agreement, purportedly executed by appellant Lehr, which is at the heart of this litigation. Contained in said guaranty agreement at paragraph 5 is a warranty of attorney provision authorizing any attorney to appear for the guarantor and confess judgment against him for the amount for which the guarantor may be or become liable under said guaranty agreement, plus 2% thereof as attorney's fees. Further contained in said document, entitled Guaranty, appeared the following paragraphs:

1. The Guarantor hereby unconditionally guarantees to Bank, its successor and assigns, the prompt and punctual payment of $3,500,000 of the principal amount of the Note, when due by acceleration on account of default, maturity or otherwise, together with interest on the said $3,500,000 in principal amount at the rate specified in the Note. The liability of the undersigned for a $3,500,000 portion of the indebtedness evidenced by the Note, together with interest on that portion as specified above, shall not be limited or reduced by any partial recovery by Bank on account of the indebtedness evidenced by the Note from the mortgaged real estate, from any other guarantor, or otherwise. The liability of the Guarantor hereunder may be enforced by Bank or any subsequent assignee of this Guaranty.

7. The liability of any Guarantor hereunder is not conditioned upon the liability of any other Guarantor. If the Guarantor is more than one person, their liability hereunder shall be joint and several.

The record reflects that on Sunday, April 23, 1972, appellant Lehr, Dr. Mattioli and their wives dined together. Following their meal, Mattioli presented Lehr with a packet of papers indicating that they were the documents for the bank loan and requesting that Lehr review the same. Following a partial review of same, appellant, on April 25, 1972, dictated a memorandum to Mattioli which included the following statements:

"... Further, if anyone of the capital guarantors would be unable to come up with his share of the $3,500,000 pool, anyone or all of us would be on the hook to take up the slack...."

Near the end of the memorandum, appellant further wrote:

"But I can't let you or the track down at this time so just have to go along like a lamb to the slattering block...." (signed) Carl B. Lehr.

It is at this juncture in time that Lehr's and Mattioli's recollections differ.

In his deposition, Lehr testified:

A   That would be April 28th, and it was late in the day Friday afternoon, I should say about 4:30, and he appeared in a hurry, never sat down in my office. I had a private office there which had two entrances, and he came in the private entrance, knocked on the door, and I opened it, and he came in, and he told me at the time that he was in a hurry, he had a taxicab there which he left running there waiting, and he came to get my signatures on the papers that would be required to close the loan.

He explained that somebody at the bank—and I don't recall who that was—had agreed to wait for him until five o'clock, and he had to be sure to get this parcel of papers back to that individual by five o'clock. So he said, you know, "Carl, either you sign it, or you don't sign, but if you don't sign it, why, the Raceway goes down the tubes right now."

Q   Now, had he brought with him any documentation, or did he ask you to—

A   Well, he had a lot of papers with him, and I signed perhaps four or five different things.  Now, there was no time afforded to read these things individually, and I trusted Dr. Mattioli.  After all, had been working with him in the building of the Raceway for two years.

So he said, "You have to sign here, you have to sign here, and you have to sign there."  And I did this simply to prevent the whole thing from collapsing at the moment, according to the way he phrased it.

Q   Do you recall whether one of the documents you signed was a guaranty on that Friday, April 28?

A   No, I have no recollection of any specific items that were signed.  It was just a case like, you know, "Here are the papers now.  You sign here."  And I signed.  "And here is another one," and then so I signed.

Q   Now, do you recall, is it your recollection that you did sign some guaranty?

A   Oh, yes.  They were the—apparently they were the documents that were required by the bank.  (T. 54a–55a)

On cross examination, appellant reiterated his recollection of the April 28, 1972 meeting with Dr. Mattioli:

Q   You did go along, and you did sign the documents, including the Guaranty?

A   I signed whatever he brought to me that day.  I didn't enumerate it.  I didn't count it.  I didn't read it.

Q   But I think you did say in answer to Mr. Swift's direct examination earlier this morning that among those documents which you say you signed on that Friday was a guaranty of the loan.

A   No, I didn't say there was a guaranty in it.  I said, as I am saying now, that I signed four or five times, whatever papers Doc put in front of me, and that was it.  But whether the papers included a guaranty, I didn't know. (T. 94a)

It is interesting to note that the Pledge Agreement (and probably Subordination Agreement, although the record is unclear) with Appellant's purported signatures affixed are dated April 28, 1972!  (T. 73a)

Most critical to the instant case is Appellant's unequivo-cal—almost dogged—testimony that the signature appearing on the guaranty dated April 25, 1972 was not his; that it was a forgery.

Q   I am asking if you can identify the one on the right.

A   This signature is not mine on the right.

Q   But the words spell your name, do they not?

A   There are two words that do spell my name.

Q   Why isn't that your signature, if you can tell?

A   Well, if I say so myself, as I write my name in a unique way of forming the capital letter "C" of my first name, and this is a poor imitation.

Q   Is there any other reason?. . .

A   And that was a Tuesday (meaning April 25, 1972). Yes.  That was a Tuesday.  I definitely signed nothing on that Tuesday, definitely.  (T. 53a)

And, on cross-examination:

Q   Now, Mr. Lehr, I am going to hand you a document entitled "Guaranty," which has just been produced by Mr. McKim from the bank's records, which on the fourth page bears a date of April 25, 1972, and ask whether that is your signature appearing thereon. . . .

A   This is not my signature, and this is dated April 25th, a date on which I signed nothing.  I can absolutely guarantee that.  I am certain—(T. 73a–74a)

Q   I am asking about this one, Mr. Lehr.  I am asking you whether—

A   That is what you have that purports to be my signature.

Q   I am not—

A   And it isn't.  (T. 95a)

And, for the fourth and fifth time:

Q   I am talking about the document which Mr. McKim has produced from the bank records.

A   I told you that this is not my signature.  (T. 102a)

Q   You have testified—and at this point we are not arguing whether or not it is your signature, but I am

asking you whether by your saying you can't say whether it was or was not your penciled handwriting on there, and I am asking whether you deny that you made the pencil marks on the original Guaranty which I have handed you from the bank's records produced here today.

A Yes, I would deny that. I would deny that, because the thing isn't my signature in the first place so how did—how then did one or two or three or four sheets come into your possession with many scribblings on it that you think I wrote? (T. 103a)

Dr. Mattioli's recollection of the sequence of events differs sharply from that of Lehr's. Mattioli recalled delivering the loan papers, including the guaranty, to Lehr on April 23, 1972, but specifically recalled that he did not stop by Lehr's office for purposes of obtaining his signature on April 28, 1972.

... "Are you sure of the fact that you did not go to Mr. Lehr's home with documents in connection with this loan?"...

Q Did you ever go to Mr. Lehr's office to attempt to get him to sign any documents relating in any way to the term loan agreement prior to the closing?

A No. (T. 141–142a)

Earlier, Dr. Mattioli testified that he was out of the jurisdiction on Friday, April 28, 1972.

I left for Terre Haute, Indiana, on Friday, The 28th, around ten or eleven o'clock in the morning, I believe it was, to attend an affair. I got back into my office about the following Monday or Tuesday, and then I received Mr. Lehr's letter at that time. (T. 136a)

The Guaranty Agreement upon which judgment was confessed against Appellant was dated April 25, 1972 and witnessed by Dr. Mattioli. In his deposition however, Dr. Mattioli was unable to recall the specifics...

Q Now, was the signature which you have identified as that of Mr. Lehr on page 4—

A Yes.

Q —on that document placed there in your presence?

A I don't know.

Q You have no recollection?

A No, no.

Q Do you know whether the signature that you have identified as your own on page 4 of this document was placed there in Mr. Lehr's presence?

A I don't know that; I don't know that. (T. 139a)

Winston J. Churchill, an associate of the bank's law firm which participated in this transaction and who was present at the closing of the term loan agreement, testified that he neither witnessed Appellant's execution of any of the documents nor was appellant present at the closing on April 28, 1972.

Q Did you witness Mr. Lehr's execution of any documents at the closing of the term loan agreement?

A Not that I recall. I don't believe that Mr. Lehr was personally present at the closing. (T. 154a)

Quaere, who dated the pledge and Subordination Agreements and witnessed Appellant's signature on April 28, 1972?

Mr. Churchill's testimony did conflict dramatically with that of Dr. Mattioli—

A No, that is correct. I think Dr. Mattioli executed the "Witness" line in my presence on the 28th, but Mr. Bensinger presented the document at that time already signed by Mr. Lehr.

Q So it was witnessed on an occasion separate from the actual execution; is that correct?

A That is my recollection. It is a guaranty, of course, not a will. (T. 155a)

Finally, Walter D. McKim confirmed that Appellant did not execute the Guaranty Agreement in question in his presence:

Q Am I correct in concluding that the guaranty of Mr. Lehr, which is part of the bank's file and the closing of the term loan agreement, was not executed in your presence?

A   That is correct.  (T. 159a)

No expert testimony regarding Lehr's signature was presented by either side.

There are numerous inconsistencies and conflicts in the record.  For instance, Lehr admittedly signed numerous documents on the 28th (the Pledge and Subordination Agreements are dated April 28, 1972), but the Guaranty is dated April 25th, a date upon which Lehr recalls he signed no documents.  Lehr admits that he *would* have signed a Guaranty Agreement if one had been presented to him by Dr. Mattioli on the 28th; but he testified clearly and directly that he signed no documents on the 25th, although the Guaranty, witnessed by Dr. Mattioli is dated April 25th. Contrariwise, Dr. Mattioli testified he doesn't even recall witnessing same (on the 25th or at any other time).  Further, Dr. Mattioli testified that he left for Terre Haute, Indiana on the morning of the 28th; however, one of the appellee's attorneys recalled that Dr. Mattioli attended the closing on the 28th and at that time witnessed appellant's signature.

Finally, appellant testified on five separate occasions that the signature appearing on the Guaranty Agreement dated April 25, 1972 and witnessed by Dr. Mattioli was not his.

Lehr has raised three issues on appeal:  He claims (1) that the signature on the Guaranty is a forgery; (2) that his signature was obtained by fraud as part of a bank conspiracy with Dr. Mattioli; and (3) that his signature was obtained by duress and coercion.

Because we believe that appellant has produced sufficient evidence pursuant to Rule 2959(e) on the issue of the forgery of his signature, which would required same be submitted to a jury, we need not discuss issues 2 and 3 as stated above. Accordingly, we reverse and remand consistent with this opinion.

Prior to the adoption of Rule 2959(e) in 1973, the law of the Commonwealth was clear as to what standard of evidence was required in an action to open a confessed judg-

ment based upon the defense that the moving party's signature was a forgery. Our Superior Court in *Carlson v. Sherwood,* 416 Pa. 286, 287, 206 A.2d 19, 20 (1965) stated:

A party who relies on fraud or forgery has the burden in the first instance of proving the facts upon which the alleged fraud or forgery is based, and these facts must be established by evidence that is *clear, direct, precise and convincing: Sterling Electric & Furnace Co. v. Peterson,* 409 Pa. 435, 187 A.2d 285 (1965). (emphasis added)

In other words, pre 2959(e), the judgment debtor was required to offer clear, direct, precise and convincing evidence in the first instance that his purported signature was a forgery; thereafter, the burden of proof shifted to the judgment holder to establish the genuineness of the debtor's signature.

Obviously, prior to the adoption of 2959(e) the lower court was expected to weigh the sufficiency of the evidence presented by both parties and, thereafter, either open or refuse to open the judgment in question.

That onerous burden of proof imposed upon the moving party in the first instance where forgery was alleged has been altered by the adoption of Rule 2959(e).

Now, the lower court may not weigh the sufficiency of the evidence as presented in opening or refusing to open a judgment taken by confession. The change caused by the adoption of 2959(e) impacts squarely on the degree of proof required when forgery is raised as a meritorious defense. As the court in *Ritchey v. Mars,* 227 Pa.S. 33, 324 A.2d 513 (1974) opined, a judgment debtor does not have to prove his case conclusively. No longer must the moving party present evidence of forgery that is clear, direct, precise and convincing as was previously the case in *Carlson v. Sherwood* (supra). We believe that the key change caused by 2959(e) above, is the elimination of the requirement of "convincing" evidence; for "convincing" evidence by definition requires a weighing of the evidence. Now, we believe that a moving party no longer is required to produce clear, direct, precise

and convincing evidence; now that requirement has been substantially liberalized to require only clear, direct, precise and "believable" evidence, which would in a jury trial preclude the entry of a directed verdict against the party raising forgery as a defense, and which, if believed by a jury, would not be reversed by the entry of a judgment *non obstante veredicto.*

■ We conclude that the lower court, therefore, abused its discretion when it denied appellant's petition to open. We are of the opinion that appellant has presented clear, direct, precise and believable evidence of forgery which, not to be redundant, a jury could believe. Under the circumstances at bar, the question of appellant's signature on the Guaranty dated April 25, 1972 presents a question of fact which should be resolved by jury.

Therefore, we find that the lower court abused its discretion when it concluded that the evidence of record could only support one finding and, therefore, erred when it denied appellant's petition to open the judgment taken by confession.

The order of the lower court is reversed and the case remanded for proceedings consistent with this opinion.

Reversed and remanded.

CAVANAUGH, J., files a dissenting opinion.

CAVANAUGH, Judge, dissenting:

I dissent. The adoption of Rule 2959(e), Pa.R.C.P. has no bearing on the burden placed on the party alleging forgery. A close scrutiny of the rule itself and the comment to it as well as case law supports this view.

As this Court stated in *Foerst v. Rotkis*, 244 Pa.Super. 447, 450, 368 A.2d 805, 807:

■ It is axiomatic that one who petitions to open a confessed judgment must act promptly and aver a meritorious defense. *Wenger v. Ziegler*, 424 Pa. 268, 226 A.2d 653 (1967); *Walnut-Juniper Co. v. McKee, Berger & Mansueto, Inc.*, 236 Pa.Super. 1, 344 A.2d 549 (1975); *Chelten-*

*ham Nat. Bank v. Snelling*, 230 Pa.Super. 498, 326 A.2d 557 (1974); *Ritchey v. Mars*, 227 Pa.Super. 33, 324 A.2d 518 (1974). And it is equally true that such a petition is an appeal to the court's equitable powers, is addressed to the sound discretion of the court, and a reviewing court will reverse the determination of the lower court only for a clear and manifest abuse of discretion. *Triangle Building Supplies and Lumber Co. v. Zerman*, 242 Pa.Super. 315, 363 A.2d 1287 (Jacobs, J., filed 9/27/76), *Cheltenham Nat. Bank v. Snelling*, supra; *Bucks County Bank & Trust Co. v. DeGroot*, 226 Pa.Super. 419, 313 A.2d 357 (1973).

Because it is admitted that Lehr acted promptly the only question before us is whether the lower court abused its discretion in refusing to open judgment for want of a meritorious defense. The discretion exercised by the lower court must be guided by Pa.R.C.P. 2959(e) which states in pertinent part: "If evidence is produced which in a jury trial would require the issues to be submitted to the jury the court shall open the judgment."

The Majority notes that the burden of proving fraud or forgery is the same: "[a] party who relies on fraud or forgery has the burden in the first instance of proving the facts upon which the alleged fraud or forgery is based, and these facts must be established by evidence that is clear, direct, precise and convincing." *Carlson v. Sherwood*, 416 Pa. 286, 287, 206 A.2d 19, 21 (1965).[1] This standard has been

---

1. In *Carlson v. Sherwood, supra*, 416 Pa. at 289, 206 A.2d at 21, the court explained the shifting burden of proof in forgery cases:

    It is true that where a judgment on a note is attacked on the ground of forgery, the note itself is of no weight and from its mere existence no presumption of valid execution arises: *Yank v. Eisenberger*, 408 Pa. 36, 182 A.2d 505 (1962). Under such circumstances, the burden of proof shifts to the judgment holder to establish the genuineness of the signature on the note. However these principles apply only where the judgment debtor offers clear, direct, precise and convincing evidence in the first instance that the signature is a forgery.

    *See also Ritchey v. Mars, supra.* The *Carlson* court resolved an apparent conflict between its holding and that of *Yank v. Eisenberg, supra.* Although neither *Yank* nor the more recent case of *Wolgin v. Mickman*, 233 Pa.Super. 218, 335 A.2d 824 (1975), outline the burden to be imposed on the party alleging forgery, the burden was met in

referred to as the higher equitable standard of proof, see *M. H. Davis Estate Oil v. Sure Way Oil*, 266 Pa.Super. 64, 403 A.2d 95 (1979), and whether the evidence rises to this standard so to justify its submission to the jury is a question of law for the court. *Greenwood v. Kadoich*, 239 Pa.Super. 372, 357 A.2d 604 (1976).

Thus it would seem that under Rule 2959(e) the judgment *shall* be opened when the moving party shows by clear, direct, precise and convincing evidence that a forgery has been committed since only at that point would there be sufficient evidence to justify submitting the issue to the jury. Nevertheless the Majority asserts that this "onerous burden" placed on the moving party has been altered by 2959(e) because under that rule the lower court is no longer permitted to weigh the evidence. In *Ritchey v. Mars*, 227 Pa.Super. 33, 36 n.4, 324 A.2d 513, 515 n.4 (1974), this court stated in reference to the 1973 Amendment to Rule 2959: "Thus, a court can no longer weigh the evidence in support of the defense, but must only determine whether there is sufficient evidence to allow the issue to go to the jury." However, this language, when viewed in its proper context, does not compel nor permit the result reached by the Majority.

As noted in *Kardos v. Morris*, 470 Pa. 337, 368 A.2d 657 (1977), prior to the amendment to Rule 2959 it was established that equitable considerations were of prime importance when considering a petition to open judgment:

> ... To open judgment, the petitioner must not only aver a valid defense but he must also establish equitable considerations which impress the court with the need for relief.

both cases by clear and convincing evidence. In *Funds for Business Growth v. Maraldo*, 443 Pa. 281, 285, 278 A.2d 922, 924 (1971) it was stated that "... when dealing with a claimed forged signature upon a judgment note ... the burden is put upon the holder of the note to prove the genuineness of the signature, and if affirmative evidence of the forgery remains uncontradicted, the judgment must be opened. *Industrial Valley Bank & Trust Company v. Ply Mar Furniture and Carpet Company, Inc.*, 215 Pa.Super. 430, [258 A.2d 686] (1969)." And as established in *Carlson* the affirmative evidence of forgery offered in the first instance must be clear, precise and convincing.

*Lened Homes, Inc. v. Philadelphia Department of Licenses and Inspections,* 386 Pa. 50, 53, 123 A.2d 406, 407. There must be more than mere conflict of evidence "as would persuade the court that, upon submission of the issue to a jury, a verdict in their favor could be upheld." *Ahrens v. Goldstein,* 376 Pa. 114, 121, 102 A.2d 164, 167.

*Kardon v. Morris, supra,* 470 Pa. at 340, 368 A.2d at 659, quoting *Ehnes v. Wagner,* 388 Pa. 102, 104, 130 A.2d 171, 172 (1957).

The comment to Rule 2959 explains the impact of the amendment on Pennsylvania practice:

This Rule is amended to provide a major change in Pennsylvania practice.

Historically, it has been the rule in Pennsylvania that the opening of a confessed judgment is a matter within the discretion of the common pleas court court and the appellate courts will not reverse unless there has been an abuse of discretion. This requires the defendant to do more than produce evidence which, if believed, would constitute a defense; it places on him the burden of persuading the court to open the judgment.

Dicta in both *Overmyer* [*D. H. Overmyer Co., Inc. of Ohio v. Frick Co.,* 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972)] and *Swarb* [*v. Lennox,* 405 U.S. 191, 92 S.Ct. 767, 31 L.Ed.2d 138 (1972)]... comment critically on this burden and the concurring opinion of Justices Douglas and Marshall refers specifically upon the lesser burdens of proof required under the Ohio system.

The amendment meets these criticisms by adding a new sentence to subdivision (e) of Rule 2959 stating specifically that if the defendant produces evidence, which in a jury trial would require the issues to be submitted to a jury, the court shall open the judgment.

Despite the rule change, a party seeking to open a confessed judgment must still present evidence sufficient to create a jury question. However, the subjectivity permitted by the old rule is replaced by a more objective standard: the judge is no longer permitted to question whether he is persuaded

by the evidence, but only whether the evidence presented by the defendant, if believed, created a question for the jury. Thus the standard of sufficiency the court must employ is that of a directed verdict. *Greenwood v. Kadoich, supra,* 239 Pa.Super. at 376, 357 A.2d at 606. Therefore, as when ruling on a motion for a directed verdict, the facts must be viewed in the light most favorable to the petitioner and the court must accept as true all evidence and proper inferences therefrom supporting the defense and must reject the adverse allegations of the party obtaining the judgment. *Id.*

The Majority states that Rule 2959(e) has been interpreted since its promulgation as prohibiting a court from weighing the sufficiency of the evidence and since convincing evidence by definition requires a weighing of the evidence, the moving party is no longer required to produce such evidence. While admittedly it is difficult to determine what the court in *Ritchey* meant when it said that Rule 2959(e) prohibits weighing the evidence in support of the defense, it is clear that it cannot mean what the Majority claims it does. According to the Majority even if the evidence is *not* sufficient to go to a jury the lower court *must* open the judgment. This is a limitation on the discretion of the lower court not intended by the amendment. Moreover, the Majority's holding is inconsistent with decisions of this court.

As noted above, the burden on the petitioner alleging forgery is identical to that for fraud. In *Greenwood v. Kadoich, supra,* a case decided after the amendment, we reversed the lower court's refusal to open judgment where fraud had been alleged. We stated, "The issue presented here is thus whether appellant's evidence of fraud and misrepresentation was sufficiently clear and convincing, as a matter of law, to prevent a directed verdict against her," *supra,* 239 Pa.Super. at 357 A.2d at 606 (1976). Similarly in a later case, *M. H. Davis Estate Oil v. Sure Way, supra,* we applied this higher standard of proof in affirming the lower court's opening of judgment where fraud had been alleged. Both cases also relied on the language in *Ritchey v. Mars, supra,* that in light of Rule 2959(e) the court can no longer weigh the evidence in support of the defense.

This language has been quoted widely in cases governed by Rule 2959(e). Few of these cases, however, are of much help in determining the precise meaning of the phrase. In *Foerst v. Rotkis, supra,* this court interpreted the phrase as prohibiting the trial judge from making findings of credibility. There the petitioners sought to open a judgment entered against them on the ground that they had violated a restrictive covenant in an agreement of sale which provided that they would not open a similar business within one mile of the purchased premises. We stated:

> If the appellant's statement as to the distance between their and the appellees' restaurant is accepted as true by a jury then a valid and complete defense to the judgment would have been advanced. The matter is in controversy. The appellants have stated that the distance was less than a mile, the appellees testified that the distance was greater than a mile. . . . The function of our court is not to *weigh* the evidence in support of the defense, but merely to determine whether there was sufficient evidence to go to the jury. *Wolgin v. Mickman,* 233 Pa.Super. 218, 222, 335 A.2d 824, 826 (1975) *citing Ritchey v. Mars,* 227 Pa.Super. 33, 36 n.4, 324 A.2d 513, 515 n.4 (1974).

244 Pa.Super. at 451–52, 368 A.2d at 808. In *Greenwood v. Kadoich, supra,* after quoting the language of *Ritchey v. Mars* this Court explained as follows: "Otherwise stated, the judgment should be opened where the evidence produced would be sufficient to 'prevent a directed verdict against [her].' (citations omitted)." 239 Pa.Super. at 375, 357 A.2d at 606. Thus if read to prohibit findings of credibility the *Ritchey* language is consistent with the rule and its implicit requirement that the standard of sufficiency to be employed is that of a directed verdict. *Greenwood v. Kadoich, supra.* (Therefore, all evidence in support of Lehr must be accepted as true. *Id.*) The Majority's reading of this language does not share this consistency.

In view of the above it is clear that the Majority is in error. Although where there is *any* evidence which alone would justify an inference of the disputed fact, a jury

question exists, *Heffeman v. Rosser*, 419 Pa. 550, 554–55, 215 A.2d 655, 657 (1966), there are instances where a higher standard of proof has been required. This higher or "equitable" burden is generally required in cases involving claims, such as fraud or forgery, where a serious danger of deception exists, or cases involving claims that are disfavored on grounds of public policy. *See* McCormick, Evidence § 340 at 796–98 (2d ed. 1972). As the foregoing analysis disclosed, it was not these cases that prompted the 1973 amendment, nor does the amended rule seek to alter the degree of proof required in such cases.

Now that the standard to be employed has been established, it must be determined whether the petitioner has shown by clear, precise and convincing evidence that a forgery has been committed. In the case of *La Rocca Trust*, 411 Pa. 633, 640, 192 A.2d 409, 413 (1963), the standard "clear, precise and convincing" was defined:

> The witness must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof are narrated exactly and in due order, and that their testimony is so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. . . . It is not necessary that the evidence be uncontradicted . . . , provided it "carries a clear conviction to the mind . . ." or carries "a clear conviction of its truth. . . ."

Because the standard to be applied is that of a directed verdict, all evidence must be viewed in the light most favorable to Lehr. However, testimony need not be so viewed when it is inherently improbable, or contradicted by unimpeached writings or unquestioned physical facts. *Statler v. Pennsylvania Railroad Company*, 299 Pa. 321, 149 A. 494 (1930); *Lott v. Guiden*, 205 Pa.Super. 519, 523, 211 A.2d 72, 74 (1965).

A review of Lehr's deposition alone reveals several major inconsistencies. Lehr testified that on Sunday, April 23, 1972 he was given a sheath of papers by Dr. Mattioli. Dr. Mattioli informed him that the papers were the material the bank had prepared for the loan. Lehr reviewed the papers,

but could not recall whether a guarantee was among them. However, in a memo which he wrote to Mattioli on April 25, Lehr unmistakably refers to the guaranty.

In paragraph two Lehr refers to himself as one of "those of us who are signing as Guarantors." Throughout the memo Lehr expresses his displeasure at what he has read. He states:

> Granted, they are lending us a lot of money which must be secured in the best possible way, but decently so. Apparently from time to time the Commonwealth enacts laws designed to prevent unscrupulous bankers from having the right to everything a man may possess, and in my opinion when they ask us to *waive* this, that, and the *other legal rights* that may have been placed in the law years ago, the bank is doing something *illegal*. I haven't counted them but there are at least ½ dozen waivers.

As appellant bank states, although this paragraph only impliedly refers to the guaranty form the following paragraph of Lehr's memo clearly shows his knowledge of the guaranty and its provisions:

> Further, if any one of the Guarantors would be unable to come up with his share of the $3,500,000 pool, any one or all of us would be on the hook to take up the slack.

The guaranty at issue does, in fact, require the guarantors to waive numerous potential rights and also makes each guarantor liable for $3,500,000, the full amount of the loan.

From a review of the memo it can be concluded that Lehr was not only aware of the guarantee at issue, but that he intended to sign it. In expressing his displeasure at signing, he states, ". . . I understand why you waited so long to ask for my signature, because if I had been the first one I would have refused." The memo further states:

> I don't suppose there's any need for me to submit these documents to my attorney—the only thing I could get as a result would be a big bill because these documents tie everything up so tight that the best lawyer in the land couldn't help and personally I would be ashamed to let Mr. Thornton know I was signing a thing of this kind.

·Lehr claims that he signed nothing on April 25, the date appearing on the guarantee upon which judgment was confessed. However, his testimony was at best equivocal as to whether he signed a guarantee during Dr. Mattioli's brief visit to his office which Lehr claimed took place on April 28. Although he could not recall signing a guaranty, he signed whatever Mattioli handed him and read nothing.

Moreover, in subsequent dealings with the bank Lehr did not dispute that he was a guarantor. In October, 1974 Lehr attended a meeting of the guarantors in the bank office. Later, in 1975 negotiations were underway to modify the loan agreement. Lehr testified concerning this in his deposition:

Q. Are you aware of an agreement between the Raceway and First Pennsylvania to modify the loan agreement?

A.· Am I aware of it? Oh, yes, I am aware of it.

Q. Were you asked at any time by First Pennsylvania or anyone else to reaffirm the guaranty that you say you signed?

A. Well, yes, during the summer of 1975 I had a written communication from Dr. Mattioli which included copies, presumably, that were similar to the papers that had been signed in 1972, guaranteeing the bank individually—I forget what they call these various guaranties and indemnifications and all that sort of thing, and they wanted a reaffirmation of these things. In other words, they wanted us to sign it again.

In essence Lehr's evidence of forgery amounts to nothing more than a bare assertion that he did not sign "Carl Lehr" to the guaranty on which judgment was entered. He does not claim that he did not sign the guaranty; he does assert that he signed nothing on April 25. Lehr offers no testimony or other evidence to corroborate his allegations of forgery. It is an abuse of discretion to open a judgment where only uncorroborated evidence of forgery or fraud has been presented. *Carlson v. Sherwood, supra; M. H. Davis Estate Oil Company v. Sure Way Oil Company, supra.* The fact

that Dr. Mattioli may not have actually witnessed Lehr signing the document in no way advances Lehr's argument. Moreover, Lehr admits that his signature appears on the pledge and subordination agreements which were also required by the bank. Also the record discloses that the guaranty in issue is identical to the guaranties signed by the six remaining guarantors.

In view of the foregoing, it is clear that Lehr has failed to show forgery by clear, precise and convincing evidence so as to warrant the opening of judgment.[2] I would affirm the lower court.

2. Although the Majority states that Lehr has raised three issues on appeal, in his brief appellant addresses only the issue of forgery. Therefore, he has abandoned the argument that his signature was obtained through fraud and duress and coercion.